**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| COMPUTER SERVERS AND RECORDS | ) | Case No.: |
| OF GOOGLE INC. FOR INFORMATION | ) | |
| ASSOCIATED WITH THE E-MAIL ACCOUNT | ) | <u>Under Seal</u> |
| DATT998@GMAIL.COM | ) | |

<u>**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT**</u>

I, Special Agent Simon Dinits, being duly sworn, depose and state as follows:

**I.     INTRODUCTION AND SUMMARY OF PROBABLE CAUSE**

1.  I make this affidavit in support of an application for a warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require the Internet Service Provider Google, a provider of electronic communication and remote computing services, headquartered at 1600 Amphitheater Parkway Mountain View, California, to disclose information associated with the e-mail accounts DATT998@GMAIL.COM ( "Target Account 1") and DAVIDTOM569@GMAIL.COM ("Target Account 2"), including subscriber information, records, and the contents of wire and electronic communications, and thereafter to authorize government agents to search that information and seize the items described particularly in Attachment B to this affidavit and to the warrant.

2.  As set forth in detail below, my investigation of the Target Accounts indicates that they are associated with an unlawful conspiracy to solicit payments from aliens from Vietnam in exchange for facilitating their applications through the United States Consulate in Ho Chi Minh City (hereinafter "the Consulate") for visas to the United States. The facts uncovered by my investigation establish that there is probable cause to believe that the records and contents of the wire and electronic communications pertaining to the Target Accounts are evidence, fruits and

instrumentalities of criminal violations of 18 U.S.C. § 1546 (fraud and misuse of visas, permits, and other documents), 18 U.S.C. § 201 (bribery of public officials and witnesses), and 18 U.S.C. § 371 (conspiracy to commit these offenses).

## II.     AGENT BACKGROUND

3.      I am a Special Agent with the Diplomatic Security Service ("DSS") of the United States Department of State.  I am currently assigned to the Criminal Fraud Investigation Branch where I conduct investigations in support of the Department of State in addition to other duties.  I have been a DSS Special Agent since 2008.  I have completed numerous law enforcement academies and training seminars, including the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia.

4.      In my current capacity as a DSS Special Agent, I have participated in numerous investigations involving criminal violations of federal law.  Specifically, I am familiar with the federal laws relating to fraud and the misuse of visas and other consular documents, bribery of public officials, immigration fraud, financial fraud, and money laundering.  Through my experience (i) debriefing witnesses and defendants concerning public corruption in the visa process, immigration fraud, bribery of public officials, and money laundering; (ii) reviewing records that reflect telephonic or email associations consistent with corruption in the visa process; (iii) conducting surveillance of individuals; (iv) monitoring and collecting data on typical and atypical patterns of visa approvals and denials; and (v) executing both physical and electronic search warrants; I am able to identify the patterns and methods by which government officials and middlemen obtain bribes in exchange for approving fraudulent visas.

5.      The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who

have been involved in this investigation; documents that I have reviewed; and my training and experience.  Because this affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation.  Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of this application for a criminal complaint.  Where I have reported statements made by others, or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

## III.    FACTS ESTABLISHING PROBABLE CAUSE

6.      The conspiracy includes, among other persons, SESTAK, a U.S. national; BINH T. VO, a U.S. national ("BINH VO"); ANHDAO T. NGUYEN, a Vietnamese national ("ALICE NGUYEN"); HONG VO, a U.S. national; and TRUC THANH HUYNH ("TRUC HUYNH"), a Vietnamese national.  Between August 2010 and September 2012, SESTAK, a Foreign Service Officer with the U.S. Department of State, worked as the Chief of the Non-Immigrant Visa ("NIV") Unit of the Consular Section of the Consulate.[1]  SESTAK was the Consulate's NIV Chief and supervised approximately four other consular officers.

7.      BINH VO, who resided in Vietnam, was the General Director of the Vietnam office of a multi-national company located in Vietnam.  SESTAK and BINH VO are acquaintances who were known to socialize together in Ho Chi Minh City.  ALICE NGUYEN is BINH VO's spouse, and resided in Vietnam.  HONG VO is BINH VO's sibling, and resided in Vietnam.  TRUC HUYNH is BINH VO and HONG VO's cousin, and resided in Vietnam.

---

1 The Consular Section of the Consulate is made up of three working units – Immigrant Visa, Non-Immigrant Visa, and American Citizen Services.  SESTAK was employed at the Consulate from August of 2010, until leaving post on September 6, 2012, in preparation for an active duty tour with the U.S. Navy.

A.    <u>Overview of the Fraudulent Visa Scheme</u>

8.    Based on evidence uncovered through the course of the investigation, your affiant believes that the scheme operated as follows: SESTAK agreed to approve NIVs for applicants for a fee.  HONG VO, BINH VO, and other co-conspirators had "agents" working to recruit customers – or to recruit other recruiters – to the visa scheme.  HONG VO reached out to people in Vietnam, and in the U.S., and would advertise that "the deal" was being facilitated by a "lawyer" who could guarantee visas for people to come to the United States.  (The investigation has uncovered no evidence of any attorney being involved in the effort to acquire visas.) SESTAK's co-conspirators also underscored that the "lawyer" could get visas for people who generally would not be able to get visas on their own, such as people who had been previously refused visas, people who resided in the countryside, people who had not traveled outside of Vietnam, etc.  BINH VO, HONG VO, TRUC HUYNH, and others would then obtain biographical data and photos from customers in order to prepare their visa applications for them. They would submit the customers' applications online and obtain appointments for interviews at the Consulate.  TRUC HUYNH and others would also assist people in preparing for NIV consular interviews by providing sample questions and answers.  Soon after submitting the visa application – in typically 3 days or less – the customer would receive an appointment at the Consulate, be interviewed by SESTAK, and be approved for a visa.  The co-conspirators advertised that the charge would be between $50-70,000 per visa, but also that they would sometimes charge less.  They also encouraged recruiters to raise the price and keep the amount that they charged over the established rate as their own commission.  Customers would pay for their visas in Vietnam, or by routing money to co-conspirators in the United States.  TRUC HUYNH and others would collect money from customers in Vietnam. SESTAK received several

4

million dollars in bribes for approving the visas.  He ultimately moved the money out of Vietnam by using money launderers through off-shore banks, primarily based in China, to move funds to a bank account in Thailand that he opened in May 2012.  He then used the money to purchase real estate in Phuket and Bangkok, Thailand.  BINH VO and ALICE NGUYEN also had money laundered through off-shore banks to bank accounts in the United States.

       B.    <u>Investigative Leads</u>

       9.    In July 2012, the Consulate received a letter from a confidential source ("the Letter") that claimed that a "facilitator" was soliciting bribes from applicants in exchange for the issuance of U.S. visas.  In the Letter, the source claimed that between May 20, 2012, and early July 2012, between 50 and 70 people from a specific village in Vietnam ("the Group") had obtained U.S. visas by way of a fraudulent visa scheme.  The source claimed that one could pay $55,000 in order to be guaranteed a tourist visa to the United States.  The Letter included the names, dates of birth, and photographs of seven of the individuals alleged to have procured visas through this fraudulent scheme.

      10.    All NIV applications are submitted electronically via the Department of State's Consular Electronic Application Center ("CEAC").  The Internet Protocol ("IP") address from which an applicant accesses the CEAC is captured and retained both at the time an application is first created, and at the time the application is submitted.  Therefore, for every application submitted through the CEAC, there are two associated IP addresses.

      11.    DSS investigation resulted in the identification of five of the seven applicants named in the Letter.  All five applicants had visas approved by SESTAK between May 20 and May 31, 2012.  A review of these applications showed that they were connected to two IP addresses.  Four of the five applications had been accessed from what appeared to be a dynamic

IP address beginning with the digits 216.131.79, and which was later ascertained to be assigned to a Virtual Private Network ("VPN") hosted by a U.S. Internet Service Provider ("ISP"), see infra par. 14 ("IP Address A"); or from IP address 118.69.37.10 ("IP Address B").  One application had not been accessed by either IP address A or B; however, this application, dated May 21, 2012, was for an applicant whose sister's NIV application had been accessed by IP address A, and whose visa was issued by SESTAK two days later, on May 23, 2012.

       C.     The Three Tainted IP Addresses

      12.     DSS review of Consulate records revealed that many of the applications adjudicated by SESTAK were accessed from one of three IP addresses (hereinafter "Tainted IP Addresses").  Further investigation showed that the three IP addresses from which the applications were accessed were connected to HONG VO, BINH VO, and ALICE NGUYEN and her family.

      13.     DSS review of Consulate records revealed that approximately 425 NIV applications (for 419 unique applicants)[2] had been accessed from IP Address A or IP Address B, between February and September 2012.  SESTAK conducted the initial interview for 404 of the 419 applicants and approved visas for 386 applicants.  SESTAK tried to issue visas to an additional 11 of the 404 applicants that he initially interviewed, but the system kicked back the applications due to certain data mismatches; all 11 applicants were ultimately re-adjudicated and approved by other officers without further interviewing.  SESTAK gave 4 of the 404 applicants that he initially interviewed "soft refusals,"[3] because they were missing documentation or had

---

[2] Several of the 419 visa applicants submitted more than one visa application.

[3] When an applicant receives a soft refusal, the applicant can have the visa re-adjudicated without having to submit a new application.

not paid certain fees required for their specific visa classes; all 4 of these applications were

subsequently issued visas by other consular officers.  Of the 15 applicants initially interviewed

by other officers, 13 were refused visas.  SESTAK overturned the refusal of one of these 13.  Six

others submitted new applications between 1 and 6 days after their refusal and were re-

interviewed and issued visas by SESTAK.

       i.      IP Address A is Registered to HONG VO

     14.     A review of records on the American Registry for Internet Numbers ("ARIN")

website revealed that IP Address A was assigned to Black Oak Computers Inc. ("Black Oak"),

an ISP with headquarters in California.  Records obtained from Black Oak revealed that a single

Black Oak Virtual Private Network ("VPN")[4] account was used to access all 408 NIV

applications submitted from IP Address A, and that the subscriber on this account was HONG

VO of an address in Denver, Colorado ("Denver Address"), with a Google e-mail address that

included HONG VO's first and last name ("HONG VO Google Account").  A subsequent check

of Department of State passport records revealed that HONG VO had also listed the Denver

address on her U.S. passport application in 2006.

     15.     There is also evidence that BINH VO used the Black Oak VPN Account.  In a

Google chat, dated July 10, 2012, recovered from a court-authorized search warrant executed on

the HONG VO Google Account, BINH VO wrote to HONG VO, "strong VPN has not been

---

4  A VPN is a technology that isolates one computer's traffic to another computer's traffic by
creating an encrypted tunnel between two computers.  By using a VPN, a person can route all of
his traffic to the Internet through a second computer, thereby making it appear that he is
accessing the Internet directly from the second computer.  Some websites block traffic coming
from certain IP addresses or certain countries.  In order to circumvent such blocks, a user can use
a VPN connection through an IP address or country that is allowed to visit the blocked website.
Once a user establishes his Internet connection through the VPN, all of his traffic will appear to
originate from the ISP that hosts the VPN.

working all night, what's up w/ that?  I figured you . . .  were on then . . ."  HONG VO replied

that BINH VO should try again and that the VPN was working.

    ii.        <u>IP Address B is Associated with BINH VO's Work Office in Vietnam</u>

       16.      DSS investigation revealed that, unlike IP Address A, IP Address B was an IP

address with service provided by an ISP in Vietnam.[5]   Review of evidence in the form of IP

address trails, and geographic tags embedded in photographs emailed by the co-conspirators

indicated that IP Address B is tied to BINH VO's workplace.

       17.      BINH VO was the General Director of the Vietnam office of a multi-national

company ("BINH VO Company").  The Company's website lists an address for the Company's

office in Ho Chi Minh City ("BINH VO Company Address").

       18.      Review of information obtained through a court-authorized search warrant

executed on BINH VO's Google Account ("BINH VO Google Account"), revealed that BINH

VO repeatedly accessed his personal email from IP Address B.  The header information for at

least 17 emails in BINH VO's Google email account indicated that they were sent from IP

Address B.   At least three of these emails contained photograph attachments, for a total of five

photos; all three emails had been sent from an iPhone.  Approximately four of the photographs

had GPS coordinates embedded in the exchangeable image file format ("EXIF") data[6] that

appeared to correspond to approximately a one-block vicinity of the BINH VO Company

Address.  The timestamps in the headers of the emails were within approximately 1 to 4 minutes

---

5  According to the APNIC website, IP Address B and IP Address C are assigned to ISP's
located in Vietnam.  Therefore, the United States cannot serve legal process to receive subscriber
information for the relevant IP address log-ins.

6  EXIF data is encoded in digital photographs and may include geographic information,
including GPS location information for where a photograph is taken.

of the timestamps in the photographs' EXIF data, which strongly suggests that the emails were sent from a location in close proximity to where the photographs were taken. Furthermore, the header information for another email located in BINH VO's Google email account, dated March 7, 2012, included the name of a server that the email was routed through. The name of the server contained the name of the BINH VO Company, which strongly suggests that the BINH VO Company operated the server.

     iii.      Applications Connected to IP Address C

19.     DSS review of Consulate records revealed that SESTAK also exhibited a pattern of approving visas connected to a third IP Address. Approximately 80 visa applications were created or last accessed from IP address 113.161.71.157 ("IP Address C"), between February 2012 and September 2012. SESTAK interviewed and issued visas to 75 of these 80 applicants.

     iv.      IP Address C is Associated with ALICE NGUYEN's Family Home in HCM, Vietnam

20.     DSS investigation revealed that, like IP Address B, IP Address C is an IP address with service provided by an ISP in Vietnam. Evidence in the form of IP address trails, and geographic tags embedded in photographs emailed by the co-conspirators, indicates that IP Address C is tied to the residence where ALICE NGUYEN's parents live in Vietnam ("ALICE NGUYEN Family Home").

21.     Open source information indicated that the ALICE NGUYEN Family Home is a residential rental building.

22.     DSS investigation revealed that BINH VO and ALICE NGUYEN repeatedly accessed their personal email accounts from IP Address C.

23.     A court-authorized search warrant was executed on a Yahoo email account belonging to ALICE NGUYEN's father.  Review of the IP logs for this account indicated that ALICE NGUYEN's father had logged into his account approximately 256 times between November 2, 2011, and December 12, 2012.  Over 80% of these log-ins were made from IP Address C.  ALICE NGUYEN's father's 2011 U.S. NIV application listed the ALICE NGUYEN Family Home as his residence and his place of employment; ALICE NGUYEN's father's NIV application, which was submitted from IP Address C on October 12, 2011, also listed BINH VO as the individual who had prepared the application.

24.     Additionally, ALICE NGUYEN's sister-in-law and brother listed the ALICE NGUYEN Family Home as their home address and their work address on their 2012 US visa applications.  Their visa applications were accessed from IP Address C.

25.     The header information for approximately 19 emails in the BINH VO Email Account (which spanned the date range of April 18, 2011 through September 10, 2012) indicated that BINH VO sent them via IP Address C.

26.     Of the 19 emails sent from the BINH VO Google Account via IP Address C, at least 7 had photograph attachments that were taken with an iPhone.  Two of these emails, dated November 29, 2011, and April 13, 2012, contained photos with EXIF data that included GPS tags of where the photographs were taken.  The coordinates in the EXIF data of both photographs were within approximately one block of the ALICE NGUYEN Family Home.  The time stamps captured in both photographs' EXIF data was within approximately one minute of the time stamps captured in the headers of the emails, which strongly suggests that the pictures had been sent from within close proximity of the ALICE NGUYEN Family Home.

D.      Wire Transfers to ALICE NGUYEN from Individuals Linked to Five Applicants Who Received Visas From SESTAK

27.     DSS investigation, including the review of consular records and financial records, has revealed money payments made to ALICE NGUYEN's Wells Fargo account in the U.S., in connection with Sestak's approval of five visa applications in May 2012.

28.     On or about May 21, 2012, a $35,000 money transfer was made from the Sun Trust Bank account of Person 3 to ALICE NGUYEN's Wells Fargo account.  On or about May 21, 2012, a visa application was submitted to the Consulate for T.T.M.L; that visa application listed Person 3 as T.T.M.L.'s U.S. point of contact and Person 3's work address as the U.S. destination.  Sestak issued a visa to T.T.M.L. on May 22, 2012.

29.     On or about May 22, 2012, a visa application was submitted to the Consulate for N.T.M.L. from IP Address A, and listed Person 3 as N.T.M.L.'s U.S. point of contact and Person 3's work address as the U.S. destination.  Sestak issued a visa to N.T.M.L. on May 23, 2012.

30.     On or about May 21, 2012, a visa application was submitted to the Consulate for K.M.T. from IP Address A, and listed an address in Hawaii as the destination address (hereinafter "Hawaii Address").  On or about May 23, 2012, a visa application was submitted to the Consulate for T.T.N. that also listed the destination address as the Hawaii Address.

31.     Person 4, Person 5, and Person 6 were all associated with the Hawaii Address or with residents of the Hawaii Address.  On or about May 21, 2012, Person 4, who lived at the Hawaii Address, transferred $45,000 from a Bank of Hawaii account to ALICE NGUYEN's Wells Fargo account.  On or about May 22, 2012, Person 5 transferred $20,000 from a Bank of Hawaii account to ALICE NGUYEN's Wells Fargo account.  On or about May 22, 2012, Person 6 transferred $15,000 from a Wells Fargo account to ALICE NGUYEN's Wells Fargo account.

32.     Sestak approved both visa applications for K.M.T. and T.T.N. on May 22, 2012 and May 23, 2012.

33.     On or about May 22, 2012, a $20,000 money transfer was made from Person 7's Bank of Hawaii account to ALICE NGUYEN's Wells Fargo account.  On or about May 30, 2012, a visa application was submitted to the Consulate for T.V.P. from IP Address B, and listed Person 7 as the U.S. point of contact.  Sestak approved T.V.P.'s visa application on May 31, 2012.

E.     SESTAK's Transfer of Funds to a Thai Bank Account During the Conspiracy

34.     DSS investigation revealed that SESTAK opened at least one bank account at the Siam Commercial Bank PLC located in Bangkok, Thailand ("SESTAK Thailand Bank Account"), in May 2012.

35.     DSS review of financial records revealed that between June 20, 2012, and September 11, 2012, 35 transfers totaling approximately $3.2 million dollars were made to the SESTAK Thailand Bank Account. The majority of the transfers came from the Bank of China.

36.     DSS investigation revealed that over the calendar year before September 2012, SESTAK earned approximately $7,500 per month after taxes from both his position as a Foreign Service Officer with the U.S. Department of State, and as a reservist with the U.S. Navy.

F.     Transfer of Funds to ALICE NGUYEN's U.S. Wells Fargo Account

37.     DSS investigation revealed that between June 25, 2012, and September 6, 2012, approximately 39 international transfers totaling approximately $2.9 million were made into the ALICE NGUYEN Wells Fargo Account.  Thirty-six of the transfers came from the Bank of China.  At least one of the transfers appeared to originate from the same Bank of China account that had transferred some of the funds to the SESTAK Thailand Bank Account.

12

38.     DSS review of records from the ALICE NGUYEN Wells Fargo Account from January 18, 2011, through May 20, 2012, revealed that the main source of income into the account were direct deposits from Company A.  Company A is a real estate company.  From January 31, 2011, to February 29, 2012, ALICE NGUYEN received approximately $60,114.34 from Company A.

G.     Statements Made By Co-Conspirators Regarding the Conspiracy

39.     DSS review of information acquired through several court-authorized search warrants executed during the investigation revealed electronic chats and emails from HONG VO and BINH VO advertising and discussing aspects of the fraudulent visa scheme.

40.     In a chat dated July 16, 2012, HONG VO discussed the fraudulent visa scheme with an acquaintance that she was encouraging to locate customers.  She described it as a "unique opportunity" and stated "you could also make some good $$ on the side."  HONG VO stated that she had met "this lawyer . . . who is really close to me now."  She further described that the "lawyer" could guarantee people visas to the United States, including people who "can't get a VISA to the States . . . or want to go but they have no chance."  She stated that people who received the visas usually overstayed the visas.  When asked about the price, HONG VO said the cost was $50-70,000, but that the "lawyer" could go as low as $20,000.  HONG VO also stated that the recipient of the email could take a commission for referring a customer.

41.     In an email dated July 5, 2012, HONG VO discussed the fraudulent visa scheme with an acquaintance.  HONG VO asked if the acquaintance or the acquaintance's parents, "know anyone in Vietnam who wants to go to the US but can't because either 1) they will most likely get rejected or 2) they have already been rejected and there's no way for them to come."  She described that she knew someone who can "get people to the States" and that it cost about

13

$50,000.  She continued, "[t]his opportunity will only last for a few more months and after that it's over. . . .  It's only for a tourist Visa (not citizenship) but once you go . . . you can disappear (get married) or return back to Vietnam and get the green light to go whenever you apply for another Visa to go to the States.  Please keep this information on the dl."   At the time the email was written, the scheme would have been expected to only last a few additional months, because SESTAK was scheduled to depart Ho Chi Minh City in September 2012 for a deployment with the U.S. Navy.

42.      In an electronic chat between BINH VO and a family member, dated April 9, 2012, BINH VO said that it may have someone who would want to pay in the US, "and if so, I will have that person transfer money to your bank account."  BINH VO then stated, "You should open a USD account at Vietcombank to be safe as HSBC can be checked by US gov't. . . .  Just to be safe, you should not have over $10 grand in your HSBC account, but you can in the Vietcombank account."

H.      <u>Yahoo Shell Accounts Used by BINH VO and Other Co-Conspirators</u>

43.      DSS review of information acquired through a court-authorized search warrant executed on the BINH VO Google Account revealed an email dated May 28, 2012, that contained what appeared to be a list of approximately 11 email accounts and accompanying passwords ("Yahoo Shell Accounts"); and another email in the account, dated March 5, 2012, that contained one email account and apparent accompanying password ("Yahoo Shell Accounts"). The passwords for these 12 email accounts followed a standard formatting, by which each password began with the word "vietnamusa" and was followed by a four digit number.  Those email accounts and accompanying passwords were:

a.      craigle1992@yahoo.com PW: vietnamusa1992;

b.      tinale83@yahoo.com PW: vietnamusa1983;

c.      cathypucik@yahoo.com PW: vietnamusa1989;

d.      lieu.singer@yahoo.com PW: vietnamusa1995;

e.      mytran1996dep@yahoo.com PW: vietnamusa1996;

f.      tuanlamdep@yahoo.com PW: vietnamusa1997;

g.      sophisticatedmoi99@yahoo.com PW: vietnamusa1999;

h.      tranmy336@yahoo.com PW: vietnamusa1336;

i.      nguyenivan607@yahoo.com PW: vietnamusa1607;

j.      gagalove880@yahoo.com PW: vietnamusa1880;

k.      brigtneywhy875@yahoo.com PW: vietnamusa1875; and

l.      Davidyoung199026@yahoo.com PW: vietnamusa1990.

44.     DSS review of information acquired through search warrants executed on 11 of the 12 Yahoo Shell Accounts revealed that the co-conspirators used several of the Yahoo Shell Accounts to receive biographical information for visa applicants, to include scans of identity documents and visa photos, which were sent by applicants and by other co-conspirators.  The Yahoo Shell Accounts were also used to receive interview appointment confirmations from the Consulate; and to email visa photos, appointment confirmations, or biographical information for visa applicants to other known members of the conspiracy.

45.     In total, information for approximately 258 individuals who subsequently had visa applications adjudicated during the period of the conspiracy was sent to or from the Yahoo Shell Accounts.  Sestak conducted the initial interviews of 252 applicants and issued visas to 243 of them.  SESTAK tried to issue visas to an additional 6 of the 252 applicants, but the system kicked back the applications due to certain data mismatches; all 6 applicants were ultimately re-

adjudicated and had visas approved by other officers without a further interview. SESTAK gave

an additional 2 of the 252 applicants that he initially interviewed "soft refusals."

46.     Your affiant believes that the co-conspirators used the Yahoo Shell Accounts to

hide their identities and involvement in the fraudulent visa scheme.

I.     Target Account 1

47.    DSS review of Google records acquired through a court authorized search executed

on the BINH VO Google Account revealed an email, composed on January 12, 2012, that

contained the name, passport number, telephone number, year of birth, and CEAC ID number for

two visa applicants, H.T.K.L and V.M.T.L. The information contained in the email corresponded

to two visa applications that were submitted for these two applicants on January 12, 2012 from

IP Address C.  SESTAK issued visas to both applicants on January 13, 2012.

48.    The same email, dated January 12, 2012, also contained the text, "Gmail:

datt998@gmail.com Password: usavietnam."  This password corresponded with the format of the

passwords listed in two emails located in the BINH VO Google Account, which contained 12

email accounts and what appeared to be 12 accompanying passwords.  See supra par. 59.  As

discussed above, court-authorized search warrants executed on 11 of the Yahoo Shell Accounts

revealed that they were shell accounts used by BINH VO and other members of the conspiracy to

share visa applicant information in order to prepare visa applications.  See supra pars. 60-62.

49.    Your affiant believes that Target Account 1 was yet another shell account used by

BINH VO and other members of the conspiracy to share applicant information, such as

biographical data and photographs, to communicate with applicants, and to communicate with

other members of the conspiracy. The similarity between the password listed for Target Account

1 and the 12 passwords listed for the Yahoo Shell Accounts – and the similar manner in which

the log-in information for Target Account 1 and the 12 Yahoo Shell Accounts was stored by

BINH VO in his Google account – indicates that there is probable cause to believe that Target

Account 1 was created and used to further the visa-fraud conspiracy and to hide the co-

conspirators' involvement in the conspiracy.   Additionally, the fact that the account information

for Target Account 1 was included in an email that contained applicant data for two applicants

whose applications were submitted from IP Address C and whose visas were approved by Sestak

further suggests that Target Account 1 was used for purposes related to the conspiracy. Your

affiant believes that a review of the contents of Target Account 1 will provide further evidence of

the visa fraud conspiracy.

       J.      <u>Target Account 2</u>

     50.    DSS review of Google records acquired through a court authorized search warrant

executed on the BINH VO Google Account revealed an email, composed on January 12, 2012

that contained the text, "Gmail: davidtom569@gmail.com password visausa20120."  This

password corresponded with the format of the passwords listed in two emails located in the

BINH VO Google Account, which contained 12 email accounts and what appeared to be 12

accompanying passwords.  <u>See</u> <u>supra</u> par. 59.  Your affiant believes that Target Account 2 was

an additional shell account used by members of the conspiracy to share applicant information,

such as biographical data and photographs, to communicate with applicants, and to communicate

with other members of the conspiracy. The similarity between the password listed for Target

Account 1 and the 12 passwords listed for the Yahoo Shell Accounts – and the similar manner in

which the log-in information for Target Account 1 and the 12 Yahoo Shell Accounts was stored

by BINH VO in his Google account – indicates that there is probable cause to believe that Target

Account 1 was created and used to further the visa-fraud conspiracy and to hide the co-

conspirators' involvement in the conspiracy.  The fact that the password listed for Target

Account 2 contained the word "visa" also suggests that the account was also used to promote the

visa fraud conspiracy. Your affiant believes that a review of the contents of Target Account 2

will provide further evidence of the visa fraud conspiracy.

## IV.    EVIDENCE LIKELY TO BE OBTAINED FROM SEARCHING THE TARGET ACCOUNTS

51.    Based on my training and experience, and information provided to me by other law

enforcement agents, I know the following:  First, searches of e-mail accounts usually provide

information that helps identify the user(s) of the e-mail accounts.  Second, individuals who use e-

mail in connection with criminal activity, or activity of questionable legality, often set up

separate e-mail accounts to be used solely for limited criminal purposes.  This is often part of an

effort to avoid detection and to separate personal communication from communication and

information that is related to the criminal activity.  Third, when the criminal violation involves a

conspiracy, a search of an e-mail account often allows the identification of additional co-

conspirators.

52.    In this case, a search of Target Account 1  and Target Account 2 will help

determine whether the known and unknown members of the visa-fraud conspiracy used Target

Account 1 and/or Target Account 2 to further conspiratorial activities, such as, for instance, (1)

to receive information from visa customers, or recruiters of visa customers, in order to prepare

visa applications; (2) to correspond with visa customers, or recruiters of visa customers,

regarding the status of their visa applications; (3) to collect, divide, or deposit the illegal "fees"

paid by the applicants; and (4) to coordinate matters related to the processing of the applicants'

visas through the fraudulent scheme.  The search may also identify other conspirators, and other activities in furtherance of the conspiracy.

53.     There is no basis to believe that the Target Accounts contain any privileged communications.

54.      In summary, there is probable cause to believe that Sestak was conspiring with BINH VO, ALICE NGUYEN, HONG VO, TRUC HUYNH, and others, to extract bribes from visa applicants in exchange for the issuance of the visas; and that evidence of their activities exists in Target Account 1 and Target Account 2.

## V.    STATUTORY BASIS FOR THE REQUESTED SEARCH AND SEIZURE: THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

55.     The requested search warrant is authorized by the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701-2711.

a.      18 U.S.C. § 2703(a) provides, in part:

A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant.  A governmental entity may require the disclosure by a provider of electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

b.      18 U.S.C. § 2703(b) provides, in part:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection —

(A) Without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant; or . . . .

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that

19

is held or maintained on that service —

        (A) On behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

        (B) Solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

        c.      The Government may also obtain records and other information pertaining to a subscriber to or customer of an electronic communication service or remote computing service by way of a search warrant.  18 U.S.C. § 2703(c)(1)(A).  No notice to the subscriber or customer is required.  18 U.S.C. § 2703(c)(2).

        d.      18 U.S.C. § 2711 provides, in part:

        As used in this chapter – (1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section; and (2) the term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

        e.      18 U.S.C. § 2510 provides, in part:

        (8) "contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication;...(14) "electronic communications system" means any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications; (15) "electronic...communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications;... (17) "electronic storage" means - (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication.

        f.      18 U.S.C. § 2703(g) provides, in part:

        Notwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service.

## VI.        SEARCH PROCEDURE AND ITEMS TO BE SEIZED

56.    Based on the foregoing, I request that the Court issue a search warrant in accordance with the Electronic Communications Privacy Act – and specifically 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(2)(A) – authorizing a search of the place identified in Attachment A to this Affidavit and to the Search Warrant, using the procedures set forth in Section I of Attachment B to this Affidavit and to the Search Warrant, and authorizing the seizure of items particularly described in Section II of Attachment B to this Affidavit and to the Search Warrant.

## VII.       REQUEST FOR NON-DISCLOSURE BY PROVIDER

57.     Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding Google not to notify any other person, including the subscriber of Target Account 1, of the existence of the warrant because there is reason to believe that notification of the existence of the warrant will result in: (1) destruction of or tampering of evidence; (2) intimidation of potential witnesses; or (3) otherwise seriously jeopardize the investigation.  The involvement of Target Account 1 and Target Account 2 as set forth above is not public and I know, based on my training and experience, that subjects of criminal investigations will often destroy digital evidence if the subject learns of an investigation.  Additionally, if Google or other persons notify anyone that warrants have been issued on Target Account 1 or Target Account 2, the targets of this investigation and other persons may further mask their identity and activity and seriously jeopardize the investigation.

58.    The United States further requests that the Order delay any notification by the government that may be required by § 2703(b) for a period of ninety days because notification of the existence of the order may seriously jeopardize the investigation, as discussed in the previous

paragraph. *See* 18 U.S.C. § 2705(a).

## VIII.   REQUEST FOR SEALING

59.      It is respectfully requested that this Court issue an order sealing, until further

notice of the Court, all papers submitted in support of this application, including this affidavit,

the application, and the warrant itself, except that a copy of the warrant, including its

attachments, shall be served upon Google.  I submit that the requested sealing is needed because

the items and information to be disclosed and seized are relevant to an ongoing investigation into

the criminal activities described above.  Based upon my training and experience, I have learned

that online criminals search the Internet for criminal affidavits and search warrants and

disseminate them to other online criminals as they deem appropriate, such as by posting them

publicly online.  Premature disclosure of the contents of this affidavit and related documents may

compromise this ongoing investigation by causing the subjects to flee or destroy or evidence.

## IX.    CONCLUSION

60.    In summary, based upon the above facts and information, I submit that there is probable cause to believe that within the information associated with Target Account 1 and Target Account 2, which are on computer servers owned, maintained, controlled, or operated by Google, headquartered at 1600 Amphitheater Parkway Mountain View, California, there exists evidence, fruits, and instrumentalities of criminal violations of 18 U.S.C. § 1546; 18 U.S.C. § 201; and an ongoing criminal conspiracy to commit these offenses, 18 U.S.C. § 371. Accordingly, I respectfully request that a warrant be issued.


_____
Special Agent Simon Dinits
Diplomatic Security Service


Subscribed and sworn to before me on July _____, 2013


_____
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA